IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SANEL HODZIC, and DAMIR MECAN, on behalf of themselves and others similarly situated,
Plaintiffs,
v.

FEDEX PACKAGE SYSTEM, INC.,
Defendant.

Civil Action No. 15-956

# MEMORANDUM OPINION

## I. INTRODUCTION

This is a proposed nationwide collective action brought by Plaintiffs Sanel Hodzic and Damir Mecan against Defendant FedEx Package System, Inc., ("FedEx"), alleging that FedEx violated the Fair Labor Standards Act, ("FLSA"), by failing to pay overtime compensation to certain delivery drivers who were authorized representatives under Standard Operating Agreements ("contractors") with FedEx. (Docket No. 18). Presently before the Court is a contested motion filed by Plaintiffs seeking conditional certification of a proposed collective action to include all contractors "who worked [as] single route package delivery drivers for FedEx in the United States from April 22, 2013 to the present, and who at any time drove a truck weighing less than 10,001 pounds." (Docket No. 36 at 15). Neither party requested oral argument. As the Motion has been fully briefed, it is now ripe for disposition. (Docket Nos. 35, 36, 39, 42, 45). After careful consideration of the parties' arguments, and for the following reasons, Plaintiffs' Motion [35] is granted, in part, and denied, in part.

1

II. BACKGROUND

   *A. FedEx Operations and Business Model*

FedEx is an international logistics company that provides many types of shipping services to its clients and operates a number of different divisions. (Docket No. 39-9 at ¶ 4). Relevant here, FedEx maintains a Home Delivery division wherein drivers are primarily used to deliver packages from a designated terminal station to residential homes. (*Id.* at ¶ 5). FedEx also has a Ground Division that specializes in business-to-business shipping wherein drivers are generally utilized to both deliver packages from a designated terminal station to the businesses, and to pick-up packages from the businesses and return them to the designated terminal station. (*Id.*).

FedEx has changed its business model vis-à-vis these delivery drivers several times over the past decade in response to numerous lawsuits alleging that FedEx committed violations of federal and state wage and hour laws by misclassifying the drivers as independent contractors. (Docket No. 39-1 at ¶¶ 4-8). Starting in May of 2010, FedEx replaced its prior independent contractor model with an "all-incorporated" business model whereby FedEx only contracts with authorized representatives of incorporated businesses, i.e., "contracted service providers," to provide delivery driver services for its Ground and Home Delivery divisions. (*Id.*; Docket No. 39-9 at ¶¶ 3, 8, 10). As FedEx no longer enters into independent contractor agreements with individuals to provide these types of services, it considers all delivery drivers to be employees of the contracted service providers and not employees of FedEx. (Docket No. 39-9 at ¶ 11). Indeed, FedEx expressly sets forth in its Standard Operating Agreements that it is the responsibility of the contracted service providers to pay overtime compensation to their employees. (Docket No. 39-1 at ¶¶ 16-17).

Under the "all-incorporated" business model, FedEx has entered into agreements with contracted service providers that are effectively owner/operators with a single work area or delivery route serviced by a single employee-driver. (Docket No. 39-9 at ¶ 10). Some contractors that operate a single work area or route also employ a second or "supplemental" driver. (*Id.* at ¶ 14). In other instances, the business owner is not a delivery driver but simply manages the business in a more traditional sense, hiring others to drive. (*Id.* at ¶ 15). Some contracted service providers offer both Ground and Home Delivery services; others offer only one type of service. (*Id.* at ¶ 6).

FedEx is in the process of transitioning from the "all-incorporated" business model to an "ISP model" under which the contractor entities are required to maintain a certain number of employee drivers and take on a certain number of routes. (Docket No. 36 at 6; 39-9). This transition has been implemented on a state-by-state basis and took place in Pennsylvania in late 2015. (*Id.*). FedEx proffers that it has preliminarily identified 2,355 contracted service providers who were assigned a single work area or a single work area with a supplemental driver across its thirty-three non-ISP states from April 2013 until the present. (Docket No. 39 at 17-19).

*B. FedEx Standard Operating Agreements*

As noted, FedEx enters into detailed Standard Operating Agreements with entities providing delivery services to its Ground and Home Delivery divisions. (*See e.g.*, Docket No. 39-10). FedEx does not contest that the terms and conditions of these agreements are the same nationwide. (*See* Docket Nos. 39-1; 39-9). The named Plaintiffs provided services for entities that contracted with the Home Delivery division and the record contains those agreements.[1] (*Id.*).

---

[1] The Court notes the form agreements that Fed Ex's Ground division utilizes are not in the record because there are no opt-in Plaintiffs in this case and neither of the Plaintiffs have driven for the Ground Division.

3

The relevant provisions of the Home Delivery division Standard Operating Agreements include the following:

> Both [FedEx] and Contractor intend that Contractor will provide […] services strictly as an independent contractor, and not as an employee of [FedEx] for any purpose. Therefore, this Agreement will set forth the mutual business objective of the two parties intended to be served by this Agreement – which are the results the Contractor agrees to seek to achieve – but the manner and means of reaching these results are within the discretion of the Contractor, and no officer or employee of [FedEx] shall have the authority to impose any term or condition on Contractor or on Contractor's continued operation which is contrary to this understanding.

(Docket No. 39-10 at 5). The Agreements detail that the Contractor is responsible to: provide vehicular equipment in accordance with all applicable laws; maintain such equipment at its own expense; bear all other operating costs and expenses; mark the vehicle with FedEx approved logos; utilize the vehicle only for delivering FedEx packages while in service; maintain logs, records and shipping documents; adhere to an agreed standard of service, including meeting customer service requirements; employ qualified individuals to act as drivers and require them to wear FedEx-approved uniforms; and demand that such drivers safely operate their vehicles. (*Id.* at ¶¶ 1.1-1.13; 2.1; 2.2). With that said, the Agreements note that the Contractor:

> shall be responsible for exercising independent discretion and judgment to achieve the business objectives […] and no officer, agent or employee of [FedEx] shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of [FedEx] shall have the authority to prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance.

(*Id.* at ¶ 1.14). The Contractor agrees to maintain insurance, including work accident and/or workers' compensation insurance, for all of its employees. (*Id.* at ¶¶ 3.1-3.6). The parties stipulate that the Contractor provide services within a primary service area or route, as assigned

4

by Fed Ex. (*Id.* at ¶ 6). The Agreements also set forth settlement and payment procedures, the term and renewals thereof, as well as termination provisions. (*Id.* at ¶¶ 4, 6, 8). Finally, the Agreements are to be construed with reference to Pennsylvania law.[2] (*Id.* at ¶¶ 10-16).

In addition to the base agreement, there are several Addenda. Addendum 16 specifies the terms and conditions of the "Contractor as a Corporate Entity and Employer." (Docket No. 39-10 at 26). These provisions require that the Contractor:

> use only personnel that Contractor ensures are treated as employees of Contractor ("Contractor Personnel" or "Personnel") for all payroll, tax, withholding, insurance and other purposes under applicable law. Contractor agrees that neither it nor any of its Personnel are to be treated as or considered to be FedEx Ground's employees for any purpose . . . .

(*Id.* at ¶ 2). Later terms specify that the Contractor:

> assume sole responsibility . . . for compliance with all applicable federal, state and local laws, including without limitation, wage payment, final payment of wages, required withholdings from wages, deductions, overtime, and rest and meal periods, and, at the request of FedEx Ground, provide evidence of such compliance.

(*Id.* at ¶ 2.3). It also obligates the Contractor to designate an "authorized officer" to deal with FedEx with respect to modifications of the terms of the agreement as well as a "business contact" who is permitted to deal with FedEx personnel as to day-to-day operations.[3] (*Id.* at ¶ 6).

### C. *Delivery Drivers Hodzic and Mecan and their Businesses*

Plaintiffs Sanel Hodzic and Damir Mecan were both authorized officers of entities functioning pursuant to Standard Operating Agreements out of a FedEx terminal in Sewickley, Pennsylvania. (Docket No. 36-1 at ¶ 1; 36-2 at ¶ 2; 39-9 at ¶¶ 2-3). The parties agree that they each signed Standard Operating Agreements containing the relevant terms noted above, among

---

[2] There are also a series of standard contract provisions that are not directly relevant at this time. (Docket No. 39-10 at ¶¶ 10-16).
[3] There are terms governing the assignment of the Standard Operating Agreement to another entity approved by FedEx, among other things.

others. (*Id.*). In this regard, Hodzic signed one on behalf of his company, Sanel, Inc., on February 4, 2014 for a service area in Penn Hills, Pennsylvania. (Docket Nos. 36-1 at ¶¶ 3; 36-3). Mecan signed a Standard Operating Agreement on behalf of his company, Mecan, Inc. on April 16, 2013 for a service area "near Pittsburgh." (Docket No. 36-2 at ¶ 3). They purchased trucks with gross vehicle weights below 10,001 pounds; affixed the required FedEx logos on same; wore FedEx uniforms that they were required to purchase while making deliveries; carried FedEx scanners to track packages; picked up and delivered packages in accordance with their respective agreements during the relevant time-frame; and uploaded scanner data to FedEx's system as required. (*See* Docket Nos. 36-1; 36-2).

Plaintiffs maintain that FedEx employees at the Sewickley terminal controlled many aspects of the day-to-day operations. For example, they were not able to decline to deliver packages or to negotiate the delivery fee for such parcels. (*Id.*). Plaintiffs, who worked five or six days per week, were required to arrive at the Sewickley terminal around 6:00 a.m. or 7:00 a.m. each day. (*Id.*). They also were mandated to attend safety meetings and report customer service problems to designated FedEx staff. (*Id.*). More specifically, Mecan states that FedEx employees would squeeze numerous packages onto his fully loaded truck; that he was required to wait for late packages prior to leaving the facility; and that he paid into a program set up by FedEx that provided a substitute driver to service his route while he took vacations. (Docket No. 36-2 at ¶¶ 10, 12). Plaintiffs contend that they worked fifty hours per week during the relevant time frame, were paid on a per delivery basis and, thus, were not paid any overtime compensation for hours worked in excess of forty. (*Id.*).

In their strikingly similar declarations, Plaintiffs each note that they believe that there were approximately fifty Home Delivery drivers working out of the Sewickley terminal during

the relevant time frame who drove trucks weighing less than 10,001 pounds. (Docket Nos. 36-1; 36-2). Of these drivers, they believe that ten to twelve of them were also single route drivers. (*Id.*). Both of them also explain, verbatim, that:

> Because I saw these other drivers each day and attended meetings with them, I observed that all of these single route contractors also worked at least five days per week and regularly worked more than forty hours per week, just as I did. These individuals also did not receive any overtime pay.
> …
> I observed that all drivers at my terminal were treated alike. We were all told we were subject to the same rules and policies, safety standards, and dress standards. I personally observed that all of the drivers were treated just like I was as I saw these drivers on a daily basis, attended meetings with them, and worked alongside them as they loaded their packages each day.

(Docket Nos. 36-1 at ¶¶ 14, 16; 36-2 at ¶¶ 13-14). Hodzic adds that "I understand that there were other FedEx terminals in Pennsylvania that operated the same way, because some contractors from the Sewickley terminal later moved to provide work from other terminals." (Docket No. 36-1 at ¶ 15). There is no other information in the record concerning any other activities by these Pennsylvania drivers working at locations other than the Sewickley terminal. The record is also devoid of any evidence concerning drivers working outside of Pennsylvania or in any of the other thirty-two states where FedEx has not yet transitioned to its ISP model.

In opposition, FedEx points to the terms of the Standard Operating Agreements and other correspondence between Plaintiffs and FedEx, (including certifications, applications and the like), wherein Plaintiffs state that they were operating "businesses" that had their own employees. (*See* Docket Nos. 39-1:39-11). FedEx also relies upon the changes to the composition of Sanel, Inc. and Mecan, Inc. throughout the relevant time period. (Docket Nos. 39, 45).

7

To this end, Sanel, Inc. "operated at times" with Hodzic as the only driver for a single route but at other times had a supplemental driver servicing that route in addition to him. (Docket No. 39-9 at ¶ 16). Sanel, Inc. also operated multiple routes briefly during 2014 as it obtained an additional primary service area from another entity, Hodzic, Inc. – owned by Arnel Hodzic, who is not a plaintiff here. (*Id.* at ¶¶ 17, 19). This area was later assigned back to Hodzic, Inc. (*Id.*). More recently, in February and March of 2016, Sanel, Inc. acquired three additional service areas and has been operating in a total of 4 service areas. (*Id.* at ¶ 20). Naturally, Sanel, Inc. employed multiple drivers to service these additional areas. (*Id.* at ¶¶ 15, 21). Hodzic expanded his business in this manner because he was told in 2015 that FedEx was transitioning to an ISP model and that he needed to purchase five routes, or the equivalent of 500 stops per week. (Docket No. 36-1 at ¶ 17). Otherwise, he explains his contract would not be renewed by FedEx in April of 2016. (*Id.*).

With respect to Mecan, Inc., FedEx contends that its records show that it operated with Mecan as the only driver at times and at other times also had a supplemental driver for that single route. (Docket No. 39-9 at ¶ 16). In December of 2015, Mecan, Inc. assigned its territory to Hodzic, Inc. (*Id.* at ¶ 17). Mecan now works as a driver for a different contracted service provider. (*Id.*).

D. *Relevant Procedural History*

Plaintiff Sanel Hodzic initiated this FLSA collective action against FedEx on July 23, 2015. (Docket No. 1). A few weeks later, Damir Mecan filed his consent to opt in, joining the lawsuit. (Docket No. 3). An Amended Complaint was then filed on August 11, 2015, naming both Hodzic and Mecan as Plaintiffs. (Docket No. 4). In October of 2015, FedEx moved to dismiss the Amended Complaint under Rule 12(b)(6). (Docket Nos. 6, 7). After accepting

briefing from the parties, the Court ordered that Plaintiffs file a Second Amended Complaint setting forth all applicable facts supporting their causes of action. (Docket Nos. 12-17). Plaintiffs filed their Second Amended Complaint on December 15, 2015. (Docket No. 18). FedEx responded by submitting its Answer on December 29, 2015. (Docket No. 19).

The Court held a case management conference in February of 2016 and ordered the parties to conduct limited discovery and deferred its mandatory referral of this case to Alternative Dispute Resolution until the disposition of anticipated proceedings related to conditional certification. (Docket Nos. 25, 26). Plaintiffs filed the pending motion, their supporting brief, and evidence on April 22, 2016. (Docket Nos. 35, 36). After receiving an extension of time, FedEx responded with a brief in opposition and counter evidence on June 6, 2016. (Docket No. 39). The Court granted the parties leave to submit reply and sur-reply briefs, with Plaintiffs filing their reply on June 24, 2016 and FedEx filing its sur-reply on June 29, 2016. (Docket Nos. 42, 45). Neither party requested oral argument. As the motion is fully briefed, it is now ripe for disposition.

III. LEGAL STANDARD

Section 216(b) of the FLSA authorizes employees to bring an action on behalf of themselves and others "similarly situated." 29 U.S.C. § 216(b).

> An action to recover the liability . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id.*

Courts follow a two-tiered analysis in determining whether a case may move forward as a collective action. *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011), *rev'd*

9

*on other grounds*, 133 S. Ct. 1523 (2013). The first phase, or "notice" phase, requires that a court "make[] a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff." *Id*. If the plaintiff carries this burden, the collective action is "conditionally certified" for purposes of notice and discovery. *Id.* The second phase is addressed after all similarly situated employee members have had an opportunity to opt in and further discovery has taken place. *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 534 (3d Cir. 2012). At this "more stringent" stage, the plaintiff must show by a preponderance of the evidence that the class members are similarly situated. *Id.* Articulating the differences in these two stages of the collective action certification analysis, the Third Circuit has explained that the initial step of conditional certification asks whether similarly situated plaintiffs do, in fact, exist; by contrast, the second stage asks whether the specific plaintiffs who have opted-in are, in fact, similarly situated to the named plaintiffs. *Id.* at 536 n.4 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010)).

Conditional certification poses a lower threshold, requiring a "modest factual showing" that the proposed plaintiffs are similarly situated. *Symczyk*, 656 F.3d at 192-93. This standard is not particularly high—it merely calls for "some evidence, 'beyond mere speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected the other employees." *Id.* at 193 (citing *Smith v. Sovereign Bancorp, Inc.*, Civ. A. No. 03-2420, 2003 WL 22701017, at *3 (E.D. Pa. Nov. 13, 2003)). Generally, plaintiffs meet the standard by producing some evidence indicating common facts among the parties' claims, and/or a common policy affecting all the collective members. 7B Wright, Miller, & Kane, *Federal Practice and Procedure: Civil* § 1807, at 489–90 (3d ed. 2005).

IV. DISCUSSION

Plaintiffs Hodzic and Mecan seek conditional certification of a proposed nationwide collective action of delivery drivers challenging FedEx's alleged misclassification of them as contractors rather than as employees and thereby failing to pay overtime compensation to which Plaintiffs believe they are entitled under the FLSA. (Docket Nos. 35, 36, 42). Beyond Plaintiffs, who both delivered packages out of the Sewickley, Pennsylvania FedEx terminal, no other individuals have joined this lawsuit, by filing opt-in notices or otherwise. (*See* Docket Report, Civ. A. No. 15-956). More specifically, Plaintiffs pursue certification of a putative class defined as:

> [a]ll individuals who 1) either individually or through a business entity entered into a FedEx Operating Agreement to deliver packages on behalf of FedEx in the United States; 2) operated a vehicle weighing less than 10,001 pounds at any time; 3) drove that vehicle on a full-time basis any time from April 22, 2013 to the present; and 4) worked as "single work area" or "single work area with a supplemental" delivery driver.

(Docket No. 35-2). FedEx asserts that Plaintiffs' proposed collective action could include approximately 2,355 individuals across thirty-three different states. (Docket Nos. 39, 45). FedEx contests conditional certification, arguing initially that Plaintiffs have failed to meet their burden to demonstrate that there are similarly situated individuals because it has no driver-employees under the challenged "all-incorporated" business model. (*Id.*) FedEx alternatively maintains that even if similarly situated individuals are located, conditional certification should be denied because there are too many individualized issues pertaining to potential plaintiffs that would make it difficult to litigate the FLSA claims on a class-wide basis. (*Id.*).

Although the Court is not yet in a position to decide the ultimate merits of Plaintiffs' overtime claims, the initial step is to define the claims at issue. *See Dunkel v. Warrior Energy*

*Servs., Inc.*, 304 F.R.D. 193, 199 (W.D. Pa. Dec. 23, 2014) (citation omitted) ("The Court notes at the outset that it is not to consider the disposition of the merits of the claims. Nevertheless, it is necessary to look at what the claims are in order to decide whether other employees are 'similarly situated' for the purposes of notice."). The FLSA establishes federal "'overtime guarantees that cannot be modified by contract.'" *Davis v. Abington Memorial Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Symczyk*, ___ U.S. ____, 133 S.Ct. at 1527)). Relevant here, an employer must pay its employees "one and one-half times the employer's regular wage for hours worked in excess of forty hours per week." *Id.* (citing 29 U.S.C. § 207). The parties do not contest that truck drivers operating vehicles with gross weights less than 10,001 pounds are generally not exempt from FLSA overtime requirements. *See, e.g., Dunkel*, 304 F.R.D. at 199-200 (explaining the relevant exemptions regarding truck drivers operating vehicles weighing more than 10,000 pounds).

Hence, the central dispute in this matter is whether there is an employer-employee relationship between Plaintiffs, any potential opt-ins, and FedEx. (*See* Docket Nos. 36, 39, 42, 45). As the Court of Appeals has explained:

> [o]ur first inquiry in most FLSA cases is whether the plaintiff has alleged an actionable employer-employee relationship. An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee...." [29 U.S.C.] § 203(d). An "employee" is "any individual employed by an employer." *Id.* § 203(e)(1). To "employ" means "to suffer or permit to work." *Id.* § 203(g). As we have recently recognized, the breadth of these definitions is both intentional and obvious: When determining whether someone is an employee under the FLSA, "economic reality rather than technical concepts is to be the test of employment." Under this theory, the FLSA defines employer "expansively," and with "striking breadth." The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is "the broadest definition that has ever been included in any one act." *In re Enterprise Rent–A–Car Wage &*

> Hour Emp't Prac. Litig., 683 F.3d 462, 467-68 (3d Cir. 2012) (citations omitted).

*Thompson v. Real Estate Mortgage Network*, 748 F.3d 142, 148 (3d Cir. 2014). This Court next turns to the "economic realities test," as delineated by the Court of Appeals:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991) (quotation omitted).[4] To prevail on the merits of their claims, Plaintiffs must show that these factors, on balance, weigh in favor of them being deemed employees. *Id.*

Returning to the conditional certification issues, it is Plaintiffs' burden to make a "modest factual showing" that there is "a factual nexus between the manner in which the employer's alleged policy affected Plaintiffs and the manner in which it affected other employees." *Symczyk*, 656 F.3d at 195. As Judge Hornak of this Court has cogently explained, "[i]n other words, Plaintiffs must show three things: (1) an employer policy, (2) that affected the Plaintiffs in a particular way, and (3) that also affected other employees in a similar way." *Dunkel*, 304 F.R.D. at 201.

---

[4] The Court also notes that the Third Circuit has explained that:

> [u]nder the FLSA, multiple persons or entities can be responsible for a single employee's wages as "joint employers" in certain situations. 29 C.F.R. § 791.2. One such scenario occurs where both employers "exert significant control" over the employee, *N.L.R.B. v. Browning–Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982), "by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 C.F.R. § 791.2(b)(3). Under these circumstances, each joint employer may be held jointly and severally liable for the FLSA violations of the other, in addition to direct liability for its own violations.

*Thompson*, 748 F.3d at 148.

Rather than taking this type of straightforward approach, the parties engage in a wide-ranging survey of non-binding caselaw examining numerous "misclassification" cases and other decisions from outside this jurisdiction ruling on litigation between FedEx and delivery drivers. (*See* Docket Nos. 36, 39, 42, 45). They also debate whether this type of FLSA overtime case involving a dispute over whether there is an employer-employee relationship is capable of being conditionally certified. (*Id.*). As this Court held in *Hively*, conditional certification is governed by a relatively "lenient" standard, and a more robust evaluation of the sufficiency of the claims and defenses takes place at the second step or final certification stage of this litigation.[5] *Hively v. Allis-Chalmers Energy*, Civ. A. No. 13-106, 2013 WL 5936418, at *4-5 (W.D. Pa. Nov. 5, 2013). It is this Court's opinion that FedEx's arguments opposing conditional certification generally raise merits-based defenses that are best resolved at step-two, including, FedEx's position that it has no employees under the "economic realities test" and the alleged individualized issues regarding potential class members that may disqualify them as prospective members of the class. *See e.g., Scovil v. FedEx Ground Package Sys., Inc.*, 811 F. Supp. 2d 516, 519-20 (D. Maine Sept. 16, 2011) (declining to resolve the dispute of whether Maine FedEx drivers were independent contractors or employees at step-one and reserving ruling on the application of the "economic realities test" until step-two); *Hively*, 2013 WL 5936418, at *4-5 (individualized defenses more properly adjudicated at step-two). Therefore, the Court finds that Plaintiffs' FLSA overtime claims are generally capable of conditional certification and FedEx's position to the contrary is overruled.

---

[5] The Court notes that FedEx initially put forth its contract defense in a Rule 12(b)(6) motion to dismiss, which the Court denied without prejudice, granting Plaintiffs leave to amend. (*See* Docket Nos. 6, 7, 17). Plaintiffs thereafter filed a Second Amended Complaint, to which FedEx responded by filing an Answer, implicitly agreeing that Plaintiffs had sufficiently pled that they were employees in support of their FLSA overtime claims. (*See* Docket Nos. 18, 19).

With that said, the Court cannot rely on judicial rulings in prior cases involving FedEx to justify conditional certification of a nationwide collective action in this case but must evaluate the evidence that Plaintiffs have introduced in these proceedings to determine the scope of the putative class of potential plaintiffs. *See Dunkel*, 304 F.R.D. at 207; *see also Hively*, 2013 WL 5936418, at *4-5. Having conducted its review of same, the Court holds that Plaintiffs have failed to adduce sufficient evidence to conditionally certify a nationwide collective action of FedEx Home Delivery and Ground contractors estimated as 2,335 individuals. Instead, Plaintiffs have made a "modest factual showing" for the Court to permit a collective action of FedEx Home Delivery contractors delivering packages out of the Sewickley, Pennsylvania terminal. *Symczyk*, 656 F.3d at 192-93. Through their respective declarations, Plaintiffs suggest that there were ten to twelve such individuals during the relevant time period. (*See* Docket Nos. 36-1, 36-2). The Court assesses the evidence supporting this conclusion below.

It is undisputed that FedEx had a uniform policy designating authorized representatives of contracted service providers as employees of those entities. (Docket No. 39-1; 39-9; 39-10). As such, it did not pay overtime to drivers as it expected those entities to pay overtime to their own employees per the express terms of the Standard Operating Agreements. (*Id.*). FedEx also inserted many contractual provisions in the Standard Operating Agreements which Plaintiffs believe support their case that FedEx exerted significant control over the work which was performed, including, among other things, requiring: FedEx logos to be affixed to trucks; drivers to wear FedEx uniforms; FedEx scanners to be used to track packages; drivers to meet performance and customer service standards; and, drivers to upload scanner data to FedEx's tracking system. (*Id.*) In addition, FedEx paid contracted service providers on a per delivery

15

basis. (*Id.*). It would thus appear that these policies may apply to a broad class of contractors across 33 states during the relevant time frame. (*Id.*).

However, "[t]he alleged application of a uniform policy does not, without more, show that potential class members are similarly situated." *Schneck v. Lawrence D. Brudy & Associates, Inc.*, No. CA 15-1058, 2016 WL 912299, at *6 (W.D. Pa. Mar. 10, 2016) (Mitchell, M.J.) (quoting *Asirifi v. West Hudson Sub-Acute Care Center, LLC*, Civ. A. No. 11-4039, 2014 WL 294886 (D. N.J. 2014)); *see also Moore v. PNC Bank, N.A.*, Civ. A. No. 12-1135, 2013 WL 2338251, at *5-7 (W.D. Pa. May 29, 2013) (McVerry, J.) ("Even when considering those decisions that weigh a company's blanket exemption policy in favor of conditional certification, those courts have still required more of showing than an across-the-board classification."). Here, Plaintiffs' overtime claims not only rely upon these broader policies, but they were arguably more "affected" by the facts underlying the operation of FedEx's Sewickley terminal. *Dunkel*, 304 F.R.D. at 201. Indeed, it is this more localized evidence which largely forms the basis of their overtime claims, and allegedly caused them to work more than forty hours per week during the relevant time period, possibly entitling them to overtime compensation. In this regard, FedEx employees at the Sewickley terminal: set the boundaries of the routes where Plaintiffs conducted deliveries, (i.e., Mecan, "near Pittsburgh" and Hodzic in Penn Hills), both of which are many miles from the terminal; directed that they make deliveries six days a week, at times; mandated that they arrive at the terminal each morning between 6:00 a.m. and 7:00 a.m.; delayed loading their vans with packages despite them being at the terminal on time and ready to work; overfilled the vans with numerous packages requiring delivery on many days; mandated that certain packages be returned to the terminal if delivery attempts were unsuccessful; and, required that drivers attend safety meetings at the terminal. (*See* Docket Nos. 36-1; 36-2). Simply put,

Plaintiffs' declarations suggest that FedEx personnel at the Sewickley terminal were not adhering to the terms and conditions of the Standard Operating Agreements. (*See* Docket No. 39-10 at ¶ 1.14 ("no officer, agent or employee of [FedEx] shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of [FedEx] shall have the authority to prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance.")).

Setting aside the merits of the employer-employee relationship dispute at this juncture, the facts proffered by Plaintiffs may collectively support a *prima face* case that they were caused to work in excess of forty hours a week, but their evidence concerning other similarly situated individuals affected by FedEx's business policies is sparse, at best. *Symczyk*, 656 F.3d at 192-93. To this end, Plaintiffs have set forth very similar declarations stating that there were approximately fifty other Home Delivery drivers at the Sewickley terminal and that ten to twelve of them were contractors having the same type of relationship with FedEx. (*See* Docket Nos. 36-1; 36-2). Plaintiffs worked alongside these individuals and personally observed that they were subject to the same type of work conditions as are discussed above. (*Id.*). But, the only evidence that has been proffered concerning FedEx operations beyond the Sewickley terminal is a statement by Hodzic that "I understand that there were other FedEx terminals in Pennsylvania that operated the same way, because some contractors from the Sewickley terminal later moved to provide work from other terminals." (Docket No. 36-1 at ¶ 15). While the Court accepts Plaintiffs' declarations regarding FedEx's operation of the Sewickley terminal and their first person observations of the other contractors working there, Hodzic's sole assertion as to the conditions at other, unidentified Pennsylvania terminals which relies upon hearsay from

17

unnamed declarants is not enough to broaden the scope of the putative class beyond the Sewickley terminal. *See Dunkel*, 304 F.R.D. at 203 (rejecting declarations from plaintiffs as to work conditions at locations where they did not personally work on the basis that "[t]hese attempts fail because the Plaintiffs have offered little more than a combination of hearsay, guesswork, and enthusiastic hopefulness to support their assertions").

All told, "[t]his Court cannot justify ordering and facilitating notice to a nationwide class of plaintiffs possibly numbering in the hundreds or thousands on the basis of such little factual support." *Moore*, 2013 WL 2338251, at *6. As such, the Court must limit the scope of the putative class to conform to the evidence that has been presented by Plaintiffs. *See Dunkel*, 304 F.R.D. at 207 ("Plaintiffs' Motion for Conditional Certification is granted, but the scope of the conditional certification (i.e., notice) is limited by the actual evidence Plaintiffs submitted."). It is also within the discretion of the Court to set the parameters of any such notice. "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative." *Hoffmann–La Roche v. Sperling*, 493 U.S. 165, 172 (1989). Given the Court's ruling, the Court orders the parties to meet and confer in an effort to finalize the content and form of the notice in accordance with this decision and to submit a joint proposal for the Court's consideration.[6] To that end, the Court will approve the issuance of such a notice which includes the following description of the proposed class:

> [a]ll individuals who 1) were authorized representatives under a FedEx Home Delivery Standard Operating Agreement and delivered packages on behalf of FedEx out of the Sewickley, Pennsylvania terminal; 2) operated a vehicle weighing less than 10,001 pounds at any time; 3) drove that vehicle on a full-time basis any time from April 22, 2013 to the present; and 4) worked as "single work area" or "single work area with a supplemental" delivery driver.

---

[6] Insofar as the parties are unable to agree upon the form and/or content of the notice, that issue may be referred to the neutral.

18

V. CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Conditional Certification [35] is GRANTED, IN PART, and DENIED, IN PART. An appropriate Order follows.[7]

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date: October 26, 2016

cc/ecf: All counsel of record.

---

[7] As ADR was deferred until the Court's resolution of conditional certification issues, (Docket No. 24), the Court now enters an order requiring the parties to submit a Revised Stipulation Selecting ADR Process and will refer this matter to ADR, forthwith.